IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
February 16, 2016 Session

**IN RE ASHTON B.**

**Appeal from the Chancery Court for Shelby County**
**No. CH1315033      Walter L. Evans, Chancellor**

_____

**No. W2015-01864-COA-R3-PT – Filed March 15, 2016**
_____

Petitioner adoption service filed a petition to terminate Father's parental rights, alleging several grounds under Tennessee Code Annotated Section 36-1-113(g)(9)(A) and abandonment pursuant to Tennessee Code Annotated Section 36-1-113(g)(1). The trial court denied the petition, finding no grounds to support termination. Based upon the Tennessee Supreme Court's holding in ***In re Bernard T.***, 319 S.W.3d 586 (Tenn. 2010), that the grounds contained within Section 36-1-113(g)(9)(A) cannot apply to putative biological fathers, we affirm the trial court's denial of termination on those grounds. We also affirm the trial court's finding that Petitioner failed to prove abandonment pursuant to Tennessee Code Annotated Section 36-1-113(g)(1) by clear and convincing evidence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the Court, in which W. NEAL MCBRAYER and ARNOLD B. GOLDIN, JJ., joined.

Kevin W. Weaver, Cordova, Tennessee, for the appellant, Bethany Christian Services of West Tennessee, Inc.

P. Craig Grinstead, Memphis, Tennessee, for the appellee, Earl W.

**OPINION**

**Background**

The child Ashton B. ("the child") was born in April 2013 to unmarried parents Ashlee B. ("Mother") and Earl W. ("Father"). [1] At the time of the child's birth, Mother met with Claire Depriest, a licensed clinical social worker with Petitioner/Appellant Bethany Christian Services of West Tennessee, Inc. ("Appellant") to discuss the possible adoption of the child. Mother declined, however, to place the child for adoption at that time, instead resolving to parent the child herself. As such, from the child's birth to her eventual surrender to Appellant in September 2013, the child resided continually in Mother's custody. At some point in the summer of 2013, Mother, Father, and the child began to spend considerable time together as a family, which culminated in the family moving into a home together in August 2013. Shortly thereafter, however, Mother and the child moved out of the home, and Mother began to again contemplate placing the child with an adoption agency. As will be discussed in detail *infra*, much of the dispute in this case concerns the amount of notice that Father had of the child's birth and parentage, the amount of contact Father had with the child after her birth, and whether Father provided support to Mother and the child after the child's birth.

It is undisputed, however, that on August 14, 2013, Mother met a second time with Ms. Depriest to discuss the possible adoption of the child through Appellant. During their discussion, Mother informed Ms. Depriest that Father was the biological parent of the child. The child was placed with an interim family on August 19, 2013. Having obtained his phone number from Mother, Appellant contacted Father to discuss the situation regarding the child on August 22, 2013. Father and Appellant scheduled a meeting, but Father failed to attend the meeting and then allegedly failed to keep in contact with Appellant.

Mother surrendered her parental rights to the child to Appellant on September 9, 2013 in the Shelby County Chancery Court ("trial court"). Mother's voluntary surrender was accompanied by a sworn Affidavit of Natural Mother naming Father as the biological parent of the child. The trial court awarded Appellant an order of partial guardianship over the child on the same day. Appellant undisputedly made contact with Father concerning the possible adoption of the child on September 20, 2013. Father unequivocally objected to the adoption of the child. According to Appellant, however, Father failed to follow Appellant's direction to obtain DNA testing showing him to be the biological parent of the child, and Father failed to keep in contact with Appellant. On these bases, Appellant filed a petition to terminate Father's parental rights on October 4, 2013 in the trial court, alleging grounds of abandonment by willful failure to visit and support, failure to establish parentage, failure to manifest a desire to assume custody, and failure to make reasonable and consistent support payments. Appellant thereafter placed the child with a pre-adoptive family in Virginia ("Pre-

---

[1] In cases involving the termination of parental rights, it is this Court's policy to redact the names of minor children and other parties in order to protect their identities.

Adoptive Parents"), previously chosen by Mother prior to the surrender of her parental rights.[2]

Father filed a pro se answer to the termination petition on October 16, 2013. In his answer, Father indicated that he would like to obtain DNA testing to determine the paternity of the child, but that he was unable to afford DNA testing at this time. Father again stated that, if he is the biological parent of the child, he would not agree to the termination of his parental rights and adoption. Despite the fact that the parties undisputedly lived together as a family prior to Mother placing the child with Appellant and Father had previously been in contact with Appellant regarding the possible adoption of the child, Father also alleged that he "[w]as not aware [he] had a child."

On October 18, 2013, Appellant requested that a guardian ad litem be appointed for the child, which motion was granted by order of November 4, 2013. On January 31, 2014, the trial court appointed counsel for Father and ordered that he obtain and pay for a DNA test by February 28, 2014.[3] After the February deadline passed, on March 6, 2014, Father's appointed counsel filed his notice of appearance in the trial court. On the same day, Father, by and through his counsel, filed a motion to extend the time for obtaining DNA testing, due to scheduling conflicts between Father and his counsel and Father's inability to pay for testing. Also on March 6, 2014, Father filed a petition to establish parentage in the Shelby County Juvenile Court ("juvenile court"). The trial court granted Father's motion to extend the time for DNA testing and ordered that Appellant would pre-pay for the testing pending resolution of the case. Father was ordered to complete DNA testing by March 28, 2014. DNA testing eventually established that Father was the biological parent of the child. An order to that effect was entered in the juvenile court on May 29, 2014.

On April 16, 2014, Father filed a petition in the trial court to set visitation. The trial court granted Father's motion on July 17, 2014, providing Father with monthly in-person visits with the child and weekly video-conferencing visits. On May 27, 2015, Father filed a motion for summary judgment, arguing that the undisputed facts entitled Father to judgment as a matter of law. On May 29, 2015, Father filed a motion asking that the child be returned to Shelby County so that Father could exercise in-person visitation with the child pending a final hearing. On July 8, 2015, Appellant filed a response in opposition to Father's motion for summary judgment. The trial court denied the motion for summary judgment on July 17, 2015.

---

[2] Pre-Adoptive Parents acknowledged that they were aware there was a substantial risk involved with the placement, as Father's parental rights had yet to be terminated.

[3] It appears from the record that Father had previously appeared before the trial court and indicated his intention to hire private counsel.

The trial court conducted a hearing on Appellant's termination petition on July 27–28, 2015. Mother testified that she informed Father that she was pregnant early in the pregnancy, shortly after she learned that she was carrying a child. Mother and Father, however, soon lost touch. After Mother gave birth, while she was still in the hospital, Mother first contacted Appellant regarding a possible adoption of the child. Mother resolved, however, to parent the child and did not engage Appellant's services at that time. Mother testified that she brought the child to Father in mid-June 2013 and again informed him that he was the child's biological father. According to Mother, she and Father and the child subsequently spent every day together in July 2013, typically at Father's sister's residence, where Father resided. Mother testified, however, that she and the child did not live with Father at this time and spent no more than eight nights with Father in July 2013, all of which were non-consecutive. Instead, Mother claimed that during this time, she resided with her aunt. In August 2013, Mother testified that she and Father decided to rent a home together for themselves, the child, and Mother's older daughter. The parties moved into the home on August 1, 2013, with Mother paying half the first month's rent to do so. According to Mother, however, she was soon forced to leave the home due to Father's alcohol and marijuana use. In fact, Mother testified that she stayed in the home with Father no more than four days.

Mother testified that throughout the summer of 2013 when the parties were together, Father provided no support for Mother and the child, other than one can of formula. Mother testified that although she would ask for help, Father always responded that he was unable to do so. Still, Mother testified that Father was employed part-time throughout this period. Mother also testified that the despite the fact that she often spent time with Father at Father's sister's residence, neither Father nor Father's sister ever gave Mother support, such as meals.

According to Mother, after she moved out of the home she shared with Father, she had difficulty finding an appropriate living situation and providing for the child. Accordingly, in mid-August 2013, she contacted Appellant again regarding a possible adoption of the child. Mother testified that she informed Ms. Depriest that Father was the biological parent of the child at this time. Eventually, Mother chose Pre-Adoptive Parents as the proper placement for the child, and the child was eventually transferred to their physical custody.

Ms. Depriest testified that she is a licensed clinical social worker, who has been employed by Appellant for several years. Ms. Depriest generally represented Appellant in all of its interactions with Mother and Father. Ms. Depriest confirmed that she first came into contact with Mother and the child while Mother was in the hospital shortly after the birth. According to Ms. Depriest, however, Mother was not aware that she was pregnant until the day that she gave birth;[4] accordingly, it was Ms. Depriest's understanding that Father could not have known of the child's existence until after the birth. After Mother chose to parent the

---

[4] According to Ms. Depriest, Mother learned of her pregnancy after she was required to undergo a blood test for her employer. According to Ms. Depriest: "They did a blood test and she was pregnant and delivered that same day because her blood pressure was high."

- 4 -

child, Ms. Depriest had no further contact with her until August 2013. Ms. Depriest testified that Mother contacted her on August 14, 2013 to discuss placing the child with Appellant because Mother "was in a fairly desperate situation . . . feeling like she didn't have stable housing." Accordingly, Mother agreed for Appellant to take temporary custody of the child on August 19, 2013, when the child was placed with an interim family.

Ms. Depriest testified that after learning Father's name and contact information from Mother, she contacted Father on August 22, 2013 to discuss the possible adoption of the child. According to Ms. Depriest, she and Father scheduled a meeting for August 24, 2013. Father, however, did not appear for the meeting. According to Ms. Depriest, she attempted to contact Father several times about rescheduling, but he never responded. Ms. Depriest and Mother therefore proceeded with the surrender of Mother's parental rights on September 9, 2013 and the choosing of a prospective adoptive family.

Having not heard from Father since August 22, 2013, Ms. Depriest testified that on September 13, 2013, Appellant hired a private investigator to locate Father. Based on the report from the private investigator, on September 18, 2013, Appellant sent letters to two addresses where Father purported to reside, asking Father to contact Appellant about the child's adoption. Father received one letter and contacted Appellant on September 20, 2013. During this phone call, Ms. Depriest testified that Father objected to the adoption of the child, asked about a DNA test, and requested visitation with the child. According to Ms. Depriest, she put Father in contact with a lab to perform the DNA testing. Father, however, failed to contact the lab about DNA testing. Instead, Ms. Depriest spoke with Father again on September 24, 2013, wherein Father asked if there was a way to obtain a free DNA test. According to Ms. Depriest, she informed Father that he could file a parentage action in juvenile court. Ms. Depriest testified that Father indicated that he was "familiar with that process." During this conversation, Ms. Depriest also indicated to Father that she could not allow visitation with the child until she had spoken with her supervisor. Ms. Depriest finally testified that after the September 24, 2013 conversation, she had no further contact with Father until the trial court ordered video-conference visitation. Based on the lack of communication and Father's failure to follow through with DNA testing, Ms. Depriest indicated that Appellant decided to go forward with a petition to terminate Father's parental rights.

Ms. Depriest also testified that she facilitated the video-conference visitation between Father and the child once it was ordered by the trial court. It was undisputed that of the fifty-three possible visits, Father only attended eighteen. According to Ms. Depriest, sometimes she or Pre-Adoptive Parents cancelled the visits. In the majority of cases, however, Father cancelled the visits after informing Ms. Depriest that he had no transportation or when he simply failed to get in touch with Ms. Depriest to confirm the visits. From all the testimony in the record, it appears that Father and the child interacted appropriately throughout all the visits, though the video-conference visits were sometimes difficult given that the child was pre-verbal.

Father's and his sister's testimony somewhat conflicted with Mother's regarding his involvement in the child's life in the summer of 2013. First, Father testified that he had no knowledge of the child's birth or existence until mid-June 2013, when the child was approximately three months old. Second, Father and his sister testified that Mother and the child began residing with Father in his sister's home in July 2013. Thus, both Father and his sister testified that Father had daily contact with child in July 2013, wherein Father acted as the child's caregiver. Father and his sister testified that they provided support such as food, clothes, and diapers for Mother and the child, as Mother was not working during this time. Father's mother also testified that she provided clothing and diapers for the child in the summer of 2013.

Father also provided his own explanation for his and Mother's move to their own home and the subsequent deterioration of the relationship. According to Father, Mother and the child lived with Father in the new home for at least two weeks before moving out. Father testified that the reason Mother moved out was not his alleged drinking problem, but Mother's desire that only she, the children, and her own mother live in the house, rather than Father. When Father refused to move out of the home to allow Mother's mother to move in, Father testified that Mother left the home and asked that her name be taken off the lease. Father's sister and mother also testified that Father did not have a drinking or drug problem. After Mother left the home, Father testified that he had no further contact with Mother or the child because he did not know their whereabouts. Indeed, Mother did not involve Father in her decision to place the child with Appellant. According to Father, he only learned of the possible adoption when Ms. Depriest contacted him.

Father and his mother also testified regarding his income and employment. Father testified that was employed part-time during the summer of 2013 as a janitor earning $8.50 per hour. In addition, Father's mother testified that Father receives social security disability benefits of approximately $800.00 per month and food stamps of approximately $200.00 per month. According to Father's mother, Father has never had a driver's license due to a severe learning disability that hinders his reading skills. Father also testified that after the child was placed with Appellant he no longer worked as a janitor, but instead helped with another individual's landscaping business. Father testified that he earns approximately $500.00 per week doing landscaping work when the weather is favorable.

Father, his sister, and his mother all generally testified to Father's skills as a parent, and their desire that the child be returned to Father's custody. Father's mother and sister also indicated that they would assist Father in any way necessary should the child be returned to him.

Pre-Adoptive Parents testified regarding the oversight that Appellant provided after the child was placed in their care, their care of the child, and the relationship that has developed between them and the child. Pre-Adoptive Parents also indicated that if termination was not granted, they would work to facilitate a smooth transition from their custody to Father's.

The trial court entered its written order on August 28, 2015, finding that no grounds to support termination had been proven by clear and convincing evidence. Specifically, the trial court found no willful failure to visit because Appellant placed the child "several hundred miles away from where Father could see or visit the child," and therefore, his failure to visit "should not be held against him." Similarly, the trial court found no willful failure to support because Father "on more than one occasion at every turn made an effort to display and to show that he had not abandoned the child in any respect." Finally, the trial court found that none of the grounds contained within Tennessee Code Annotated §36-1-113(g)(9)(A) were applicable because Father "has timely exercised any knowledge that he had as far as the process and procedure that was necessary for him to establish parentage of the minor child and taken necessary steps to establish parentage." Because no grounds existed to support termination, the trial court did not consider the best interest of the child. The trial court later denied a motion by Appellant to alter or amend its ruling.

## Issues Presented

Appellant raises two issues, which are slightly restated as follows:

> 1. Whether the trial court erred in denying Appellant's petition to terminate the parental rights of Father to the minor child when clear and convincing evidence supported a finding that parental rights should be terminated in accordance with Tennessee Code Annotated § 36-1-113(g)(9)(A).
>
> 2. Whether the trial court erred in denying Appellant's petition to terminate the parental rights of Father to the minor child when clear and convincing evidence supported a finding that parental rights should be terminated in accordance with Tennessee Code Annotated § 36-1-102(1)(A).

## Discussion

As recently explained by the Tennessee Supreme Court:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57,

65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, No. M2014-00453-SC-R11-PT, --- S.W.3d ---, 2016 WL 363993, at *1 (Tenn. Jan. 29, 2016) (footnote omitted).

Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*. at 653.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R.

App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

To the extent that this issue requires us to interpret, harmonize, and apply various statutory provisions, we apply those principles that our Supreme Court has recently outlined:

> "The most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995) (citing *State v. Sliger*, 846 S.W.2d 262, 263 (Tenn.1993)). "The text of the statute is of primary importance." *Mills v. Fulmarque*, 360 S.W.3d 362, 368 (Tenn. 2012). A statute should be read naturally and reasonably, with the presumption that the legislature says what it means and means what it says. *See BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997).
>
> Statutes that relate to the same subject matter or have a common purpose must be read *in pari materia* so as to give the intended effect to both. "[T]he construction of one such statute, if doubtful, may be aided by considering the words and legislative intent indicated by the language of another statute." *Graham v. Caples*, 325 S.W.3d 578, 582 (Tenn. 2010) (quoting *Wilson v. Johnson Cnty.*, 879 S.W.2d 807, 809 (Tenn. 1994)). We seek to adopt the most "reasonable construction which avoids statutory conflict and provides for harmonious operation of the laws." *Carver v. Citizen Utils. Co.*, 954 S.W.2d 34, 35 (Tenn.1997). Issues of statutory interpretation present a question of law, which we review de novo on appeal, giving no deference to the lower court decision. *Mills*, 360 S.W.3d at 366; *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 895 (Tenn.2011).

*In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015).

In this case, Appellant alleged several grounds for termination of Father's parental rights, including abandonment under Tennessee Code Annotated Section 36-1-113(g)(1) and failure to make reasonable and consistent payments for the support of the child, failure to seek reasonable visitation with the child, failure to manifest an ability to assume legal and physical custody of the child, and failure to establish paternity under Tennessee Code Annotated Section 36-1-113(g)(9)(A).[5] We begin with the grounds alleged under Tennessee Code Annotated Section 36-1-113(g)(9)(A).

## I.

Tennessee Code Annotated Section 36-1-113(g)(9)(A) provides that:

> The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person or, if no such petition is filed, at the time of the filing of a petition to adopt a child, is not the legal parent or guardian of such child or who is described in § 36-1-117(b) or (c) may also be terminated based upon any one (1) or more of the following additional grounds:
>
>> (i) The person has failed, without good cause or excuse, to pay a reasonable share of prenatal, natal, and postnatal expenses involving the birth of the child in accordance with the person's financial means promptly upon the person's receipt of notice[6] of the child's impending birth;
>> (ii) The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36-5-101;

---

[5] All of the statutes referenced in this Opinion are to the current versions, unless otherwise specified.

[6] Tennessee Code Annotated Section 36-1-113(g)(9)(B) defines notice as it is used throughout Section 36-1-113(g)(9)(A) as "mailing, postage prepaid, or the sending by, express mail, courier, or other conveyance, to the person charged with notice at such person's address a statement that such person is believed to be the biological parent of a child" or "the oral statement to an alleged biological father from a biological mother that the alleged biological father is believed to be the biological father of the biological mother's child[.]"

- 10 -

(iii) The person has failed to seek reasonable visitation with the child, and if visitation has been granted, has failed to visit altogether, or has engaged in only token visitation, as defined in § 36-1-102(1)(C);

(iv) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;

(v) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or

(vi) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity by the child's mother, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3); . . . .

Prior to 2003, an earlier version of the statute provided: "[t]he parental rights of any person who is not the legal parent or guardian of a child or who is described in § 36–1–117(b) or (c) may also be terminated based upon any one (1) or more of the following additional grounds. . . ." Tenn. Code Ann. § 36-1-113(g)(9)(A) (2001). In ***Jones v. Garrett***, 92 S.W.3d 835 (Tenn. 2002), the Tennessee Supreme Court held that the grounds contained in the prior version of Section 36-1-113(g)(9)(A) were inapplicable to a purported father who established paternity during the pendency of the termination action. ***Id.*** at 839–840 (holding that the father "meets the definition of 'legal parent' because he was adjudicated to be the father . . . prior to the proceeding which resulted in the termination of his parental rights"). In response, the Tennessee General Assembly amended Section 36-1-113(g)(9)(A) to include the requirement that a parent not be a legal parent "at the time of the filing of a petition to terminate the parental rights of such person." 2003 Tenn. Laws Pub. Ch. 231 (S.B. 1279) (eff. June 2, 2003). "The consequence of this amendment is that there now exists statutory authority to apply the additional grounds for termination enumerated in section 36-1-113(g)(9)(A) to persons who have established legal parentage, but did so subsequently to the filing of a petition seeking termination of their parental rights." ***In re D.A.H.***, 142 S.W.3d 267, 272–73 (Tenn. 2004).

Under the current version of the statute, the grounds outlined in Section 36-1-113(g)(9)(A) are limited to termination proceedings involving a person "who . . . is not the legal parent or guardian of such child" at the time the termination petition is filed or a person "who is described in § 36-1-117(b) or (c)." *See* Tenn. Code Ann. § 36-1-117(b) (concerning paternity petitions that are not concluded prior to the filing of a termination petition and indicating that if paternity is found, the newly established biological father's rights must be terminated prior to any adoption), (c) (describing "putative biological fathers" who, though

not legal parents of the child, must have their rights to a child terminated prior to any adoption because these fathers have filed with the putative father registry, claimed openly to be the child's father, or otherwise taken affirmative action to indicate their parental relationship with a child) (discussed in detail, *infra*). According to Appellant, Father had notice in at least the summer of 2013 that he was the alleged parent of the child, but failed to timely file a petition to establish paternity until months later, in clear violation of Section 36-1-113(g)(9)(A)(vi).[7] Appellant also alleged that Father failed "to make reasonable and consistent payments for the support of the child," failed to visit or engaged in only token visitation with the child, and failed to manifest a desire and willingness to parent the child. *See* Tenn. Code Ann. § 36-1-113(g)(9)(A)(ii), (iii), & (iv).

Here, Father disputes that the grounds contained in Section 36-1-113(g)(9)(A) may even apply to Father because of his status as a putative biological father. In contrast, Appellant contends that the grounds outlined above clearly apply to Father because, at the time the petition had been filed, *see* **D.A.H.**, 142 S.W.3d at 272–73, Father was neither the legal parent nor guardian of the child. We agree that, at the time of the filing of the petition, Father had not established that he was the legal parent or guardian of the child.

Both "legal parent" and "guardian" are defined terms in Title 36. Under Tennessee Code Annotated Section 36-1-102(28)(A), a "legal parent" is defined as:

> (i) The biological mother of a child;
> (ii) A man who is or has been married to the biological mother of the child if the child was born during the marriage or within three hundred (300) days after the marriage was terminated for any reason, or if the child was born after a decree of separation was entered by a court;
> (iii) A man who attempted to marry the biological mother of the child before the child's birth by a marriage apparently in compliance with the law, even if the marriage is declared invalid, if the child was born during the attempted marriage or within three hundred (300) days after the termination of the attempted marriage for any reason;
> (iv) A man who has been adjudicated to be the legal father of the child by any court or administrative body of this state or any

---

[7] Specifically, the evidence shows that Father was on notice, at the latest, of the child's alleged paternity in July 2013, when he told his sister about the child. His sister, in turn, undisputedly urged Father to obtain DNA testing at that time. Furthermore, Father spoke with Ms. Depriest in September 2013 about the need for DNA testing, after Father indicated that he did not want the child to be adopted. Despite this advice, Father delayed several more months before finally requesting a DNA test. Father contended, however, that his delay was the result of his inability to pay for DNA testing and his unfamiliarity with what he was required to do to ensure his rights to the child were protected.

other state or territory or foreign country or who has signed, pursuant to §§ 24-7-113, 68-3-203(g), 68-3-302 or 68-3-305(b), an unrevoked and sworn acknowledgment of paternity under Tennessee law, or who has signed such a sworn acknowledgment pursuant to the law of any other state, territory, or foreign country; or

(v) An adoptive parent of a child or adult; . . . .

Furthermore, the definition clarifies that "blood, genetic, or DNA testing" alone is insufficient to establish a man as a legal parent "without either a court order or voluntary acknowledgement of paternity pursuant to § 24-7-113." Although Father was deemed the biological and legal parent of the child after the termination of parental rights petition was filed, at the time of filing the petition, Father had not been married or attempted to be married to Mother, had not been adjudicated the child's legal father, had not executed a voluntary acknowledgement of paternity, and had not adopted the child. Thus, at the time of the filing of the termination petition, Father was not the child's legal parent.

The law is also clear that Father was not the child's guardian at the time the termination of parental rights petition was filed. Under Tennessee Code Annotated Section 36-1-102(24)(A), a "guardian" is defined as "a person or persons or an entity, other than the parent of a child, appointed by a court or defined by law specifically as "guardian" or "co-guardian" or "conservator" to provide supervision, protection for and care for the person or property, or both, of a child or adult." Again, at the time of the filing of the petition, Father had clearly not been appointed the child's guardian, co-guardian, or conservator.

Father argues, however, that despite the fact that he was not the child's legal parent or guardian at the time the petition to terminate parental rights was filed, the trial court did not err in refusing to apply the grounds outlined in Section 36-1-113(g)(9)(A) to him. To support this argument, Father cites this Court's recent Opinion in *In re Cloey R.*, No. E2014-00924-COA-R3-PT, 2015 WL 273685 (Tenn. Ct. App. Jan. 21, 2015). In *Cloey*, the Department of Children's Services ("DCS") filed a petition to terminate the parental rights of the purported father, arguing, *inter alia*, that the father failed to file a petition to establish paternity as to one child in violation of Section 36-1-113(g)(9)(A)(vi). *Id.* at *1. There was no dispute that the father in *Cloey* was neither the legal parent nor guardian of the child at the time the petition for parental rights was filed. The Court of Appeals, however, nevertheless ruled that the grounds contained within Section 36-1-113(g)(9)(A) were inapplicable because the father qualified as a putative biological father, as discussed in detail, *infra*. As explained by the *Cloey* Court:

In finding clear and convincing evidence upon this statutory ground, the trial court stated in relevant part:

- 13 -

. . . . It is uncontroverted that [the father] never followed through with legal legitimation of [one child], despite his assertion that he had DNA testing, proof of which he never provided, which showed he was the biological father. . . . Clear and convincing proof was presented that [Father] failed to legitimate [the child] as required by law, which is ground for termination of his parental rights pursuant to T.C.A. §§ 36-1-113(g)(9) and 36-1-117(c).

Although the trial court's reading of the statute is understandable, our Supreme Court has previously held that "[t]he grounds for termination in Tenn. Code Ann. § 36-1-113(g)(9) cannot be used to terminate the rights of a person who is a child's biological parent, legal parent, or putative biological father at the time the termination petition is filed." *See **In re Bernard** [**T.**]*, 319 S.W.3d [586,] 599 [(Tenn. 2010)].

***Cloey***, 2015 WL 273685, at *8. Based upon the holding in ***Cloey***, Father asserts that the grounds contained in Section 36-1-113(g)(9)(A) are also inapplicable to him as he is the putative biological father of the child at issue.

To resolve this issue, we must first consider the case relied upon in ***Cloey***, ***In re Bernard T***. In ***Bernard***, DCS attempted to terminate Junior D.'s parental rights to five children on several grounds, including two grounds contained in Tennessee Code Annotated Section 36-1-113(g)(9)(A).[8] ***Bernard***, 319 S.W.3d at 593–94. The trial court terminated Junior D.'s parental rights as to all children based on, *inter alia*, Sections 36-1-113(g)(9)(A)(iv) and (vi). ***Id.*** at 594–95. In a divided decision, our Court reversed the judgment of the trial court based upon its conclusion that DCS did not exert reasonable efforts toward reunification. ***Id.*** at 595 (citing ***State, Dep't of Children's Servs. v. Tina T. (In re B.T.)***, No. W2008-02803-COA-R3-PT, 2009 WL 3681884, at *6–9 (Tenn. Ct. App. Nov. 5, 2009)). Judge, now Justice, Holly M. Kirby dissented with regard to the majority's conclusion that DCS was obligated to exert reasonable efforts under the circumstances presented. ***Bernard***, 319 S.W.3d at 595–96 (citing ***Tina T.***, 2009 WL 3681884, at *14, 17 (Kirby, J., dissenting)). Accordingly, Justice Kirby indicated that she would have affirmed the termination of Junior D.'s parental rights as to all the children based on the grounds alleged pursuant to Section 36-1-113(g)(9)(A). ***Bernard***, 319 S.W.3d at 596 (citing ***Tina T.***,

---

[8] Specifically, DCS alleged as grounds subsections (g)(9)(A)(iv), concerning the failure to manifest a desire to assume custody, and (g)(9)A)(vi), concerning the failure to establish paternity.

2009 WL 3681884, at *18 (Kirby, J., dissenting)). The Tennessee Supreme Court thereafter granted permission to appeal. ***Bernard***, 319 S.W.3d at 596.

In its Opinion, the Tennessee Supreme Court first considered the three parent-child relationships that are recognized by Tennessee law: "biological parents, legal parents, and putative biological fathers." ***Id.*** at 598. As discussed in detail above, the term "legal parent" is specifically defined in Tennessee Code Annotated Section 36-1-102. Likewise, the term "biological parent" is defined by Section 36-1-102 as "the woman and man who physically or genetically conceived the child who is the subject of the adoption or termination proceedings or who conceived the child who has made a request for information pursuant to this part." Tenn. Code Ann. § 36-1-102(10). The terms "putative biological father" and "putative father," however, are not currently defined by Section 102.[9] Instead, the ***Bernard*** Court looked to Tennessee Code Annotated Section 36-1-117 to define the term:

> Being a child's biological father is not sufficient, by itself, to qualify a man as a child's legal parent or as a child's putative biological father. A biological father will be considered to be a child's "putative biological father" only if (1) he has filed a petition to establish his parentage of the child [citing Tenn. Code Ann. § 36-1-117(b)], (2) he has filed a timely statement with the putative father registry [citing Tenn. Code Ann. § 36-1-117(c)(1)], (3) the child's mother has identified him as the child's biological father in a sworn, written statement [citing Tenn. Code Ann. § 36-1-117(c)(2)], (4) he has been identified as the child's biological father by information that the court deems to be credible and reliable [citing Tenn. Code Ann. § 36-1-117(c)(2)], (5) he has claimed to certain individuals that he believes that he is the child's biological father [citing Tenn. Code Ann. § 36-1-117(c)(3)], (6) his name is recorded on the child's birth certificate [citing Tenn. Code Ann. § 36-1-117(c)(4)], (7) he is living openly with the child and holding himself out to be the child's father [citing Tenn. Code Ann. § 36-1-117(c)(5); Tenn. Code Ann. § 36-2-304(a)(4)], or (8) he has entered into a permanency plan or plan of care under

---

[9] Our research reveals that a bill has been introduced in the Tennessee General Assembly to define "putative father" as "a biological or alleged biological father of a child who, at the time of the filing of a petition to terminate the parental rights of such person or, if no such petition is filed, at the time of the filing of a petition to adopt a child, meets at least one (1) of the criteria set out in § 36-1-117(c) and is not a legal parent[.]" Tenn. H.B. 1531 (draft). The bill would further delete "putative biological father" wherever it appears and substitute the newly defined term "putative father." We note that this proposed definition largely mirrors the Tennessee Supreme Court's definition in ***Bernard*** and would not change the analysis in this case. The Tennessee General Assembly, however, has yet to vote on H.B. 1531.

Tennessee law or under similar laws of other states or territories. [citing Tenn. Code Ann. § 36-1-117(c)(6)].

***Bernard***, 319 S.W.3d at 598 (footnotes omitted and citations moved to text for clarity).[10] Thus, according to the Court in ***Bernard***, where a biological father engages in any of the

---

[10] For clarity, the entirety of Tennessee Code Annotated Section 36-1-117(c) is reproduced below:

The parental rights of the putative biological father of a child who has not filed a petition to establish paternity of the child or who has not established paternity of the child who is the subject of an adoption proceeding and who meets any of the following criteria shall be terminated by surrender, parental consent, termination of parental rights pursuant to § 36-1-113, or by waiver of interest, before the court may enter an order of adoption concerning that child:

(1) The biological father of a child has filed with the putative father registry, pursuant to § 36-2-318 a statement of an intent to claim paternity of the child at any time prior to or within thirty (30) days after the child's birth and has notified the registry of all address changes;

(2) The biological father has been specifically identified to the petitioners or their attorney, or to the department, the licensed child-placing agency, or the licensed clinical social worker involved in the care, placement, supervision, or study of the child as the child's father by the child's biological mother in a sworn, written statement or by other information that the court determines to be credible and reliable;

(3) The biological father has claimed to the child's biological mother, or to the petitioners or their attorney, or to the department, a licensed child-placing agency, or a licensed clinical social worker who or that is involved in the care, placement, supervision, or study of the child that the biological father believes that the biological father is the father of the child; provided, that if the biological father has previously notified the department of the biological father's claim to paternity of the child pursuant to the provisions of the putative father registry, § 36-2-318(e)(3), the biological father shall be subject to all the requirements for waiver of notice provisions of § 36-2-318(f)(2) and to all requirements for filing a paternity petition;

(4) The biological father is recorded on the child's birth certificate as the father of the child;

(5) The biological father is openly living with the child at the time the adoption proceeding is commenced and is holding himself out as the father of the child; provided that, if custody of the child has been removed from the biological mother by court order, notice shall be given to any man who was openly living with the child at time of the initiation of the custody or guardianship proceeding that resulted in the removal of the custody or guardianship of the child from the biological mother or biological father, if the man held himself out to be the father of the child at the time of the removal; or

(6) The biological father has entered a permanency plan under the provisions of title 37, chapter 2, part 4, or under similar provisions of any other state or territory in which the biological father acknowledges paternity

- 16 -

actions contained in Section 36-6-117(b) or (c), he will be considered the child's putative biological father.

The ***Bernard*** Court then went on to discuss the distinction "between persons who are a child's legal parent [or guardian] [[11]] when a termination proceeding is filed and those who are not." ***Id.*** at 599. According to the Tennessee Supreme Court, the "distinction reflects the Tennessee General Assembly's desire to provide a heightened level of protection to the rights of a legal parent facing termination of his or her rights in comparison to a person who is not a child's legal parent." ***Id.*** (citing ***Jones v. Garrett***, 92 S.W.3d 835, 839 (Tenn. 2002)). Based upon this distinction, the ***Bernard*** Court held that the less stringent grounds contained in Tennessee Code Annotated Section 36-1-113(g)(9)(A) could only apply to "the rights of a person who is not a child's legal parent [or guardian] when a termination petition is filed." ***Bernard***, 319 S.W.3d at 599.

Immediately after this pronouncement, however, the ***Bernard*** Court expanded the language of the statute to encompass not only legal parents and guardians, but also putative biological fathers, stating: "The grounds for termination in Tenn. Code Ann. § 36-1-113(g)(9) cannot be used to terminate the rights of a person who is a child's biological parent, legal parent, **or putative biological father** at the time the termination petition is filed." ***Id.*** (emphasis added). Although the ***Bernard*** Court cited its earlier Opinion in ***In re D.A.H.*** to support this proposition, the ***D.A.H.*** Opinion included no discussion of the rights of putative biological fathers or whether the grounds alleged in Section 36-1-113(g)(9)(A) may apply to putative biological fathers. *See generally* ***D.A.H.***, 142 S.W.3d at 272–77. Applying its rule to the facts presented, the ***Bernard*** Court held that the grounds contained in Section 36-1-113(g)(9)(A) could only apply to one of the five children involved in the litigation, Jordan T., because Junior D. was not the legal parent, guardian, or putative biological father of that child;[12] of the four remaining children involved in the case, the Court concluded that the Section 36-1-113(g)(9)(A) grounds could not apply because Junior D. was

---

of the child.

[11] As the Court explained:

> These statutes also govern the termination of the rights of persons who are a child's "guardian" as defined in Tenn. Code Ann. § 36-1-102(24). Because this case does not involve guardians, we have omitted the reference to guardians that can be found in many of the statutes discussed in this case.

***Id.*** at 599 n.29.

[12] The ***Bernard*** Court held that Junior D. had "no legally recognized right to have physical custody of" the child. Nevertheless, the Court terminated Junior D.'s rights to Jordan T., "whatever they may be[.]" ***Id.*** at 607.

either the legal father or putative biological father of those children.[13] *Id.* at 602. The Tennessee Supreme Court further concluded that with regard to the termination of Junior D.'s parental rights to Jordan T., the only grounds available were those contained within Section 36-1-113(g)(9)(A). *Id.* at 605. Thus, the ***Bernard*** Court clearly and unequivocally held that the grounds contained in Section 36-1-113(g)(9)(A), which includes the ground of failure to establish paternity, may not apply to putative biological fathers.

In its reply brief, Appellant does not dispute that Father qualifies as a putative biological father under the holding in ***Bernard***,[14] but instead argues that the ***Bernard*** holding is "inaccurate" and should not be followed by this Court. We agree that the ***Bernard*** holding appears to be in direct conflict with the express language of Tennessee Code Annotated Section 36-1-113(g)(9)(A).

First, as we previously discussed, Section 36-1-113(g)(9)(A) expressly states that it applies not only to "any person who . . . is **not** the legal parent or guardian of such child," but also to "any person . . . who **is** described in § 36-1-117(b) or (c)." (Emphasis added). The ***Bernard*** Court held that the descriptions contained within Sections 36-1-117(b) and (c) are used to determine whether a purported father is a putative biological father. ***Bernard***, 319 S.W.3d at 598. Thus, the ***Bernard*** Court indicated that the descriptions under Sections 36-1-117(b) and (c) are essentially synonymous with the legal status of putative biological father. Because the language of Section 36-1-113(g)(9)(A) expressly indicates that the grounds contained therein may apply to any person "described in § 36-1-117(b) or (c)[,]" we can only conclude that the Tennessee General Assembly intended that the less stringent grounds contained in Section 36-1-113(g)(9)(A) must apply to putative biological fathers. *See **Mills v. Fulmarque***, 360 S.W.3d 362, 368 (Tenn. 2012) (indicating that words in a statute "must be given their natural and ordinary meaning"). Stated another way, the language of (g)(9)(A) declares that the grounds listed apply to putative biological fathers, while the holding of ***Bernard*** provides otherwise.

---

[13] Specifically, an order adjudicating Junior D. as the legal father of three children was entered prior to the termination proceedings. With regard to the fourth child, Junior D. had entered into a parenting plan concerning the child, qualifying him as a putative biological father under Tennessee Code Annotated Section 36-1-117(c)(6), as later DNA testing showed Junior D. to be that child's biological parent. The ***Bernard*** Court indicated that although Junior D. also entered into permanency plans concerning Jordan T., "Junior D. cannot be considered to be a putative biological father under Tenn. Code Ann. § 36-1-117(c)(6) because he is not Jordan T.'s biological father." ***Bernard***, 319 S.W.3d at 606 n.37.

[14] Indeed, from our review it appears that Father filed a parentage action while this termination proceeding was pending, qualifying him as a putative biological father under subsection 117(b), Father "has been specifically identified to the [Appellants]" as the child's father by Mother in a sworn affidavit, qualifying him as a putative biological father under subsection 117(c)(2), and Father has claimed to Appellant that he believes he is the biological parent of the child, qualifying him as a putative biological father under subsection 117(c)(3).

- 18 -

We note that despite the ruling in **Bernard**, other panels of this Court have applied the termination grounds contained in Section 36-1-113(g)(9)(A) to parents who arguably held the status of putative biological father. First, **In re Alexis M.M.**, No. E2012-00022-COA-R3-PT, 2012 WL 3553628, at *1 (Tenn. Ct. App. Aug. 20, 2012), our Court affirmed the trial court's finding that the biological father's parental rights should be terminated on the grounds contained in Section 36-1-113(g)(9)(A)(ii), (iii), and (iv). In **Alexis**, we made clear that the biological father "always held himself out as [the child's] father" and even refer to the biological father as "Putative Father" throughout the Opinion. **Id.** at *1. Thus, under the holding in **Bernard**, the biological father was a putative biological father pursuant to Section 36-1-117(c)(3) because he "claimed to the child's biological mother that [he] believe[d] [himself] the father of the child." *See* **Bernard**, 319 S.W.3d at 598 (defining "putative biological father" with reference to Tenn. Code Ann. § 36-1-117(b), (c)). Notwithstanding the fact that the biological father clearly qualified as a putative biological father, our Court proceeded to terminate the biological father's parental rights under the grounds contained in Section 36-1-113(g)(9)(A), with nary a mention of the **Bernard** decision. **Alexis**, 2012 WL 3553628, at *5–*7.

Likewise in **In re Dixie M.M.**, No. M2012-01226-COA-R3-PT, 2012 WL 4474155 (Tenn. Ct. App. Sept. 27, 2012), our Court held that termination of the biological father's parental rights to the child was appropriate under Section 36-1-113(g)(9)(A)(iii), despite the fact that the biological father had entered into permanency plans regarding the child. **Id.** at *1, *7. Thus, pursuant to **Bernard** and Tennessee Code Annotated Section 36-1-117(c)(6), the biological father was the putative biological father of the child. *See* **Bernard**, 319 S.W.3d at 598. Regardless, our Court applied the Section 36-1-113(g)(9)(A) grounds to the biological father and again made no mention of **Bernard** or its holding. **Dixie**, 2012 WL 4474155, at *7. Indeed, in **Cloey**, which ultimately came to an opposite conclusion based upon the **Bernard** holding, our Court noted that the trial court's interpretation of Section 36-1-113(g)(9)(A), which comports with both **Alexis** and **Dixie**, was "understandable[.]" **Cloey**, 2015 WL 273685, at *8.

We must also note that the **Bernard** Court's holding that the grounds contained in Section 36-1-113(g)(9)(A) are the exclusive grounds that may be utilized when applicable likewise appears to conflict with the plain language of the statute. As previously discussed, the **Bernard** Court held that with regard to the termination of Junior D.'s parental rights to Jordan T., the only child that Junior D. was neither a legal parent nor putative biological father, Section 36-1-113(g)(9)(A) contained the "only" grounds that could be utilized to terminate Junior D.'s parental rights. Specifically, the Tennessee Supreme Court stated: "As such a person [i.e., neither a legal parent nor putative biological father], Junior D.'s rights with regard to Jordan T. can be terminated based **only** on one of the six grounds in Tenn. Code Ann. § 36-1-113(g)(9), not on any of the other grounds in Tenn. Code Ann. § 36-1-113(g)." **Bernard**, 319 S.W.3d at 604 (emphasis added). In contrast, the statute itself

- 19 -

indicates that when a defendant parent is either not a legal parent or guardian or described in Section 36-1-117(b) or (c), the person's parental rights "may **also** be terminated" by the "**additional** grounds" contained therein. Tenn. Code Ann. § 36-1-113(g)(9)(A) (emphasis added). It "is well settled that in interpreting the meaning of a word or phrase in a rule or statute, the court may use dictionary definitions." *Shockley v. Mental Health Coop., Inc.*, 429 S.W.3d 582, 591 (Tenn. Ct. App. 2013) (citing *State v. Majors*, 318 S.W.3d 850, 859 (Tenn. 2010)). *Webster's New World College Dictionary* defines "additional" as "added; more; [or] extra[.]" *Webster's New World College Dictionary* 16 (5th ed. 2014). Thus, it appears to this Court that where the grounds contained in Section 36-1-113(g)(9)(A) are applicable due to the status of the purported parent, those grounds are allowed in addition to the heightened grounds that may also be alleged against a legal parent or guardian.

In sum, the Tennessee Supreme Court in *Bernard* deemed a putative biological father on par with a legal parent or guardian and, therefore, declined to apply the grounds contained in Tennessee Code Annotated Section 36-1-113(g)(9)(A) to putative biological fathers. In so holding, the *Bernard* Court relegated the grounds contained in Section 36-1-113(g)(9)(A) to applying only to those parents whose claims to children are so gossamer as to be virtually non-existent. *See Bernard*, 319 S.W.3d at 607 (declining to indicate what, if any, rights Junior D. had to the child whose relationship with Junior D. was ultimately terminated under Section 36-1-113(g)(9)(A)). Regardless of our concerns regarding the *Bernard* Court's interpretation of Tennessee Code Annotated Section 36-1-113(g)(9)(A), however, we are not free to depart from the Tennessee Supreme Court's unequivocal holding. "The Court of Appeals has no authority to overrule or modify Supreme Court's opinions." *Bloodworth v. Stuart*, 221 Tenn. 567, 572, 428 S.W.2d 786, 789 (Tenn. 1968) (citing *City of Memphis v. Overton*, 54 Tenn.App., 419, 392 S.W.2d 86 (Tenn. 1964)); *Barger v. Brock*, 535 S.W.2d 337, 341 (Tenn. 1976). As such, "[o]nce the Tennessee Supreme Court has addressed an issue, its decision regarding that issue is binding on the lower courts." *Morris v. Grusin*, No. W2009-00033-COA-R3-CV, 2009 WL 4931324, at *4 (Tenn. Ct. App. Dec. 22, 2009) (quoting *Davis v. Davis*, No. M2003-02312-COA-R3-CV, 2004 WL 2296507, at *6 (Tenn. Ct. App. Oct. 12, 2004)); *see also Thompson v. State*, 958 S.W.2d 156, 173 (Tenn. Crim. App. 1997) ("[I]t is a controlling principle that inferior courts must abide the orders, decrees and precedents of higher courts. The slightest deviation from this rigid rule would disrupt and destroy the sanctity of the judicial process.") (quoting *State v. Irick*, 906 S.W.2d 440, 443 (Tenn. 1995)); *Levitan v. Banniza*, 34 Tenn. App. 176, 185, 236 S.W.2d 90, 95 (Tenn. Ct. App. 1950) ("This court is bound by the decisions of the Supreme Court."). Instead, we include our discussion of the statute to illustrate the apparent antinomy between the Supreme Court's holding in *Bernard* and the express language of Tennessee Code Annotated Section 36-1-113(g)(9)(A) and to respectfully suggest that further review of this issue would be beneficial.

Based upon the holding in *Bernard*, the grounds contained within Tennessee Code Annotated Section 36-1-113(g)(9)(A) do not apply where the defendant parent is a putative

biological father. Here, there is no dispute that Father qualifies as a putative biological father. Therefore, the trial court did not err in declining to terminate Father's parental rights under any of the grounds contained in Section 36-1-113(g)(9)(A).

## II.

Having determined that the grounds contained within Tennessee Code Section 36-1-113(g)(9)(A) cannot apply to Father based upon the Tennessee Supreme Court's holding in **Bernard**, we proceed to consider the grounds alleged that can apply to a putative biological father under that case, abandonment pursuant to Tennessee Code Annotated Section 36-1-113(g)(1). Section 36-1-113(g)(1) provides that one ground for termination of parental rights is "[a]bandonment by the parent or guardian, as defined in § 36-1-102." In turn, Tennessee Code Annotated Section 36-1-102(1)(A)(i) defines "abandonment," in relevant part, as:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child; . . . . .

Willful failure to visit "means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation[.]" Tenn. Code Ann. § 36-1-102(E); *see also* Tenn. Code Ann. § 36-1-102(C) (defining "token visitation" as visitation that "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child"). Similarly, willful failure to support "means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child[.]" Tenn. Code Ann. § 36-1-102(E); *see also* Tenn. Code Ann. § 36-1-102 (B) (defining "token support" as support that "under the circumstances of the individual case, is insignificant given the parent's means."

In **In re Audrey S.**, 182 S.W.3d 838 (Tenn. Ct. App. 2005), this Court discussed willfulness in the context of termination of parental rights cases:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(I) unless the parent has either "willfully" failed to visit or

"willfully" failed to support the child for a period of four consecutive months . . . .

In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. . . . Nor does it require malevolence or ill will. . . .Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. . . . .Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. . . .

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*Id.* at 863–64 (internal citations and footnotes omitted).

We recognize that the statutory definition of "abandonment" requires us to focus on the "period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights[.]" Tenn. Code Ann. § 36-1-102(1)(A)(i); *see also **In Matter of M.J.J.**, No. M2004-02759-COA-R3-PT, 2005 WL 873305, at \*5 (Tenn. Ct. App. Apr. 14, 2005) (noting the "relevant four month period that we must be concerned with"). In the present case, the four-month period for purposes of establishing abandonment by failure to visit and support is July 4, 2013 to October 3, 2013, the day before the petition was filed.

"Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." ***In re Adoption of Angela E.***, 402 S.W.3d at 640 (citing ***In re Adoption of A.M.H.***, 215 S.W.3d at 810). This Court reviews questions of law de novo with no presumption of correctness. *Id.*

### A.  Willful Failure to Visit

We begin with Appellant's contention that the trial court erred in failing to find that Father willful failed to visit the child. According to Appellant, Father's visitation with the child during the relevant period was merely token. There is no dispute that after Appellant was granted temporary partial guardianship of the child, Father and the child had no contact. We cannot agree, however, that the evidence in the record preponderates against the trial court's finding that Appellant failed to establish that willful failure to visit by clear and convincing evidence for the entire four- month period at issue.

Here, the trial court specifically found that Mother, Father, and the child "were together every day during the month of July 2013 including spending time and overnight visits with paternal relatives and visiting maternal relatives." The trial court also found Mother, Father, and the child lived together the first week of August 2013. Indeed, undisputed testimony from Mother, Father, and Father's sister supports the trial court's finding that Father visited with the child every day in July and lived with the child for the first week of August. This contact was not "insubstantial." *See* Tenn. Code Ann. § 36-1-102(C). While we agree that Father lost contact with the child in mid-August 2013 through the filing of the petition, the Tennessee General Assembly has clearly directed this Court to consider not just the time immediately preceding the filing of a termination petition, but the entire four months prior to its filing. Here, Father had substantial contact with the child within this four-month period. Accordingly, the trial court did not err in finding that the ground of abandonment by willful failure to visit had not been proven.

## B. Willful Failure to Support

Appellant next contends that the trial court erred in failing to find clear and convincing evidence that Father failed to support the child during the relevant four-month period. To support this contention, Appellant relies on Mother's testimony that during their time together, Father only provided one can of formula for the child. Again, Appellant characterizes such support as merely token.

Here, the trial court specifically found "no willful failure to support because [Father] has on more than one occasion at every turn made an effort to display and to show that he has not abandoned the child in any respect." A thorough review of the record does not support Appellant's contention that the trial court erred with regard to this ground. Again, there is no dispute that Father did not support the child in any way after she came into Appellant's custody. In the preceding weeks, however, it does appear that Father and his family supported the child. The evidence shows that Mother and the child spent every day with Father in July 2013. According to Father and his family, his family provided meals, diapers, and clothing for Mother and the child during this time. Indeed, Mother did not dispute that she was not working during the summer of 2013. Nothing in the record suggests that the child was not well-cared for in July or early August 2013. Instead, it was only after Mother was cut off from Father and his family that Mother's situation grew so precarious that she once again contemplated placing the child with Appellant. Under these circumstances, it

appears that Father and his family were providing some support for the child prior to the deterioration of Mother's and Father's relationship.

Furthermore, although the record contains proof of Father's income during the relevant four month period and thereafter, there is little evidence in the record regarding Father's expenses during this time. As the Tennessee Supreme Court stated in *In re Adoption of Angela E.*, 402 S.W.3d 636 (Tenn. 2013): "A party seeking termination of parental rights must prove by clear and convincing evidence that the opposing party had the capacity to pay support but made no attempt to do so and did not possess a justifiable excuse." *Id.* at 641. In *Angela*, the child's father made payments to the child during the relevant four-month period in the amount of $3,500.00 total, despite owing approximately $10,000 and earning $150,000 annually. Still, the Court opined that it was not enough for petitioner to demonstrate that father earned income. Instead, the Court concluded that where petitioners failed to provide evidence demonstrating father's monthly expenses, and thus, his ability to pay, they had not met their burden to prove father willfully failed to support the child. Here, the only evidence regarding expenses contained in the record relates to Father's rent, which his mother pays directly from his social security payments. Father's lack of disposable income is also underscored by his repeated statements that he could not afford paternity testing.

As we recently stated, it is "not enough for a petitioner to simply prove that [the parent] was not disabled during the relevant timeframe and therefore assume that she was capable of working and paying child support." *Noah B.B.*, 2015 WL 1186018, at *9 (citing *In re Josephine E.M.C.*, No. E2013-02040-COA-R3-PT, 2014 WL 1515485, at *18 (Tenn. Ct. App. Apr. 17, 2014), *perm. app. denied* (Tenn. July 23, 2014)) (internal quotations omitted). Furthermore, the burden is on Appellant to prove at least one ground for termination. *Angela*, 303 S.W.3d at 250 ("The party petitioning for termination carries the burden of making both of these showings [as to the ground for termination and best interest of the child].") (citing *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004); *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004)); *see also Noah*, 2015 WL 1186018, at *9 ("The burden to prove Mother's abandonment by willful failure to support rests squarely on the petitioners."). Additionally, the burden in termination of parental rights cases, as discussed above, is high. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005) ("Because the stakes are so profoundly high, Tenn. Code Ann. § 36-1-113(c)(1) requires persons seeking to terminate a biological parent's parental rights to prove the statutory grounds for termination by clear and convincing evidence. This heightened burden of proof minimizes the risk of erroneous decisions."). Given that the record contains some evidence that Father and his family were supporting the child during the early weeks of the four-month period and the record does not contain sufficient evidence regarding Father's expenses, we cannot conclude that the evidence preponderates against the trial court's finding that Father did not willfully fail to support the child during the relevant four month period.

## Conclusion

The judgment of the Shelby County Chancery Court is affirmed and this cause is remanded to the trial court for all further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are taxed to Appellant, Bethany Christian Services of West Tennessee, Inc., and its surety.

_____
J. STEVEN STAFFORD, JUDGE